IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

| | | |
|---|---|---|
| STEVEN KING, | ) | Case No. 1:19-cv-02439-REB-KMT |
| | ) | |
| Plaintiff, | ) | Hon. Robert E. Blackburn |
| | ) | |
| v. | ) | Hon. Kathleen M. Tafoya |
| | ) | |
| NATIONAL CREDIT SYSTEMS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

Pursuant to 28 U.S.C. § 1746, Ron Sapp states as follows:

1. I am the Vice President of Operations for Defendant, National Credit Systems, Inc. ("NCS").

2. I am authorized to submit this Declaration in support of NCS's Motion for Summary Judgment.

3. As the Vice President of Operations, I am charged with oversight of NCS's day-to-day collection activities which include, *inter alia*, ensuring that NCS's employees comply with company policies and procedures, client requirements and all collection laws including, but not limited to, the Fair Debt Collection Practices Act, 15 U.S.C. § 1692 et seq. ("FDCPA") and the Fair Credit Reporting Act 15 U.S.C. § 1692 et seq. ("FCRA").

4. I am personally familiar with NCS's collection practices and procedures including NCS's system for maintaining account records. All records for accounts placed with NCS are maintained on this system.

5. I have personally reviewed NCS's business records pertaining to Plaintiff, Steven King.

6. If sworn as a witness, I can testify competently to the facts stated herein.

1

## Relevant Policies and Procedures

7. NCS has internal policies and procedures in place that govern the placement of accounts with NCS for collection.

8. Likewise, NCS has internal policies and procedures in place that govern how NCS employees are to conduct themselves when attempting to collect debts placed with NCS for collection.

9. Updates to policies and procedures, as necessitated by operational changes or legal developments, are promptly communicated to all NCS employees to ensure their continued familiarity with and adherence to all such policies.

10. NCS also performs regular and ongoing audits of all such policies and procedures to ensure adherence, consistency and ongoing process improvements.

11. NCS employees are trained regarding each of these policies and procedures at the time of hire and are tested regarding their understanding of such policies and procedures at regular intervals thereafter.

12. Employees who do not follow NCS' policies and procedures are subject to discipline up to and including termination.

13. With regard to the specific subject matter of this lawsuit, NCS has developed and implemented policies and procedures for reviewing accounts placed with NCS for collection prior to the commencement of any collection activity.

14. These policies and procedures are reasonably adapted to ensure that NCS does not commence collection efforts on accounts for amounts that are not owed.

15. Further, NCS has developed and implemented policies and procedures for investigating account disputes received from consumers.

16. These policies and procedures are reasonably adapted to ensure NCS conducts a reasonable investigation upon receipt of a dispute.

17. NCS' clients represent in writing that all accounts are accurate at the time of placement with NCS.

18. NCS' client, the Citadel West / Dunmire Properties ("Citadel West"), does not have a history of providing incorrect or inaccurate information.

### NCS' Policies Regarding Dispute Investigation

19. It is NCS' policy to provide accurate information to credit bureaus. Further, it is NCS' policy to conduct a reasonable investigation when a dispute is received.

20. When a dispute is received by the consumer, the scope of the investigation is determined by the information provided by the consumer and NCS' clients.

21. When a dispute is received, NCS' employees immediately notate the account and initiate an investigation. As part of this investigation, NCS' employees review account information provided by the consumer, NCS' client, or any other person or entity to determine if the amount of the debt is correctly charged to the consumer.

### Plaintiff's Account

22. On or about January 29, 2015, Citadel West referred Plaintiff's account to NCS with a balance owed in the amount of $561.99.

23. Citadel West represented in writing to NCS that Plaintiff's account was accurate at the time it placed Plaintiff's account with NCS.

24. Subsequently, NCS initiated collection activities.

25. On August 8, 2017, Plaintiff (through his ex-fiance) disputed the debt with NCS via telephone directly. NCS's employee contemporaneously noted the dispute in NCS's account management system, which notes are kept in the regular course of NCS's business.

26. The basis of Plaintiff's dispute was that he claimed that his ex-fiancée paid the balance in full "over a year ago".

27. After receipt of the direct dispute on August 8, 2017, NCS marked Plaintiff's account as disputed with the credit bureaus and launched an investigation into Plaintiff's dispute.

28. As part of this investigation, NCS' employees reviewed account information provided by the Plaintiff and NCS' Client, and requested that its client verify that the amount of the debt placed for collection was accurate.

29. NCS' Client, Citadel West, responded that the amount asserted to be owed by the Plaintiff should be lowered to $448.64 due to unapplied credits for the Plaintiff, and that the Plaintiff still owes that balance and there is no record of payment of the same. Citadel West requested payment records if the Plaintiff had any – as Citadel West insisted, they did not receive payment in full. *See* Exhibit A, Pg. 36, Account Notes for NCS dated Sept. 7, 2017.

30. Thereafter, on September 7, 2017, NCS sent Plaintiff a letter verifying his debt, requesting proof of payment in full to Citadel West.

31. NCS continued to mark Plaintiff's account as disputed to the credit bureaus.

32. On September 21, 2017, the Plaintiff contacted NCS directly requesting that we provide him with an email address so that he could e-mail us "proof" of payment of the balance-in-full to Citadel West. *See* Exhibit A, Pg. 37, Account Notes for NCS dated Sept. 21, 2017.

33. In the interim, NCS received a dispute from the credit bureaus for Steven King's account, which had no images attached to it and only had the dispute code "109", which means

that Mr. King disputed the current balance on the account, not that he disputed that he owed the entire amount altogether, which further confuses the issues in this matter.

34. Nothing was received from the Plaintiff via email until September 28, 2017, until he emailed us a copy of the front-side of an undeposited check, which came from a bank account where he was not the payor. *See* Exhibit A, Pg. 37, Account Notes for NCS dated Sept. 28, 2017; *see also* Undeposited Check, Pg. 15.

35. A copy of the undeposited check was provided to Citadel West, who responded to state that the check was never cashed, and that the balance was still owed.

36. NCS requested proof from the Plaintiff that Citadel West deposited the check in question – whether that be by canceled check or a copy of the endorsed check.

37. NCS never received the requested proof from the Plaintiff – despite several requests for the same.

38. Citadel West continued to verify the amount as due and owing

39. Thereafter, on October 21, 2017, NCS verified his debt.

40. Exhibit A represents the sum total of all of the documents that NCS possessed through the date of filing which it received from both the Plaintiff and its client as it relates to the Plaintiff's account.

41. Plaintiff never provided any documentation to NCS that his account was paid-in-full with Citadel West, instead, stating that working with NCS to resolve this matter is essentially "not his problem". *See* Exhibit A, Pg. 39, Account Notes for NCS, generally.

### Relevant Policies and Procedures

42. NCS's procedures regarding vetting of accounts are specifically designed to ensure that NCS does not attempt to collect on invalid debt.

43. The procedures at issue in this case are continually monitored and tested to ensure they are reasonably adapted to prevent the specific errors alleged in this case.

44. To the extent that Plaintiff alleges that the debt is invalid, any alleged attempt to collect that debt from Plaintiff was the result of a bona fide error.

45. NCS has internal policies and procedures in place that govern the placement of accounts with NCS for collection.

46. Likewise, NCS has internal policies and procedures in place that govern how NCS employees are to conduct themselves when attempting to collect debts placed with NCS for collection.

47. It is NCS's routine practice to perform regular and ongoing audits of all such policies and procedures to ensure adherence, consistency and ongoing process improvements.

48. It is NCS's routine practice to promptly communicate updates to policies and procedures to all NCS employees to ensure their continued familiarity with and adherence to all such policies, as necessitated by operational changes or legal developments.

49. It is NCS's routine practice to train employees regarding each of these policies and procedures at the time of hire and to test employees regarding their understanding of such policies and procedures at regular intervals thereafter.

50. It is NCS's routine practice to discipline (up to and including termination) employees who do not follow NCS's policies and procedures.

51. NCS's clients represent in writing that all accounts are accurate at the time of placement with NCS.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on   June 26, 2020       _____
                                  Ron Sapp